442 A.2d 1114

**AIR PRODUCTS AND CHEMICALS, INC.**

v.

**Richard A. JOHNSON and Liquid Air Corporation, Appellants.**

Superior Court of Pennsylvania.

Argued Nov. 4, 1981.

Filed Feb. 19, 1982.

406

James D. Crawford, Philadelphia, for appellants.

Casper C. Schneider, Jr., New York City, for appellee.

Before BROSKY, POPOVICH and MONTGOMERY, JJ.

BROSKY, Judge:

On March 4, 1981, appellee, Air Products and Chemicals, Inc., hereinafter, Air Products, brought an action in equity against appellants, Richard A. Johnson and Liquid Air Corporation, hereinafter Liquid Air, seeking declaratory and injunctive relief restraining Johnson from accepting employment with Liquid Air for two years. An ex-parte injunction issued on March 4, 1981.[1] A hearing was held from March 23, 1981 until April 6, 1981, at which the trial court heard testimony concerning the continuance of that injunction. The court concluded and ordered on April 6, 1981 that Johnson could begin to work with Liquid Air but enjoined Liquid Air from using Johnson in their on-site operations and prohibited Johnson from disclosing any confidential information. On August 7, 1981, the court ordered the injunction extended until March 7, 1982, after it considered the voluminous post-hearing submissions presented by the parties. This appeal followed.[2] We affirm.

Johnson and Liquid Air present three questions on appeal. First, they assert that the trial court improperly constrained Johnson from participating in full employment practices at Liquid Air in light of the fact that he was not in any way burdened by a restrictive covenant in his employment contract with Air Products. Secondly, they remonstrate that, even if the injunction properly issued, that it is impermissibly broad in scope. Thirdly, they contend that the trial court denied Liquid Air its constitutionally guaranteed right to due process when it was excluded from the in camera hearing held by the trial court, when it heard evidence from

1. Pa.R.C.P. 1531.

2. This is an interlocutory appeal, as of right, pursuant to Pa.R.A.P. 311(a)(4).

which it would determine whether and what trade secrets existed. We will address each issue seriatum.

■ It is clear that our review herein is very narrow. We will look only to determine whether there were reasonable grounds, which are apparent, which justified the trial court's actions. We will not scrutinize the actions of the lower court any further unless the reasons relied upon by it were simply unreasonable or the legal analysis presented by the trial court was inaccurate. *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 426 A.2d 1123 (1981); *Boyd v. Cooper*, 269 Pa.Super. 594, 410 A.2d 860 (1979).[3]

The facts involved in this dispute are very numerous. We will describe them at some length. Air Products and Liquid Air are among the largest manufacturers and distributors of industrial gases in the United States.[4] They trade in substantially similar types of gases though their relative market positions have resulted in Air Products possessing a superior position in "on-site" sales and Liquid Gas in "merchant" sales. "On-site" gas serves large industrial customers. Gas is piped to the customer.[5] "Merchant" gas is delivered to smaller customers in tanks or cylinders.

Johnson was an employee of Air Products from 1966 to 1981. He is a college graduate, with a degree in petroleum engineering from Pennsylvania State University. Most of the experience Johnson had at Air Products was in on-site

3. We recognize that Johnson and Liquid Air assert our standard of review is broader in the instant case because of procedural irregularities Liquid Air claims exist, however, we need not address this contention because we determine that no impropriety existed.

4. Air Products is the nation's second largest producer/supplier of industrial gases. Liquid Air is fourth or fifth. Liquid Air is a subsidiary of a French industrial company which is the largest industrial gas company in the world.

5. There is testimony in the record to the effect that Air Products was a pioneer in the on-site industrial gas business. Furthermore, the record indicates that usage of the on-site mode of delivery has increased substantially since the price of oil has increased dramatically.

gas sales. Notably, from 1975 to 1981, Johnson had charge of Air Products' on-site sales. In January, 1981, he was elected a vice-president of Air Products.

This dispute arose out of a decision made in 1980 by Liquid Air to hire a vice-president in charge of marketing. Thus, Liquid Air contacted an executive search firm in New York. Air Products was a natural place to search for such a person. Sometime later, the recruiter came upon Johnson, established contact with him, and found him receptive to its proposals.

In December, 1980, Liquid Air decided that it would employ, the executive it was able to obtain, as the president of its Canadian subsidiary. The candidate was to work first, however, with Liquid Air's industrial gas division headquartered in San Francisco. The duties required of the person who filled the position involved the full range of industrial gas operations, including the on-site mode of delivery. Johnson was offered the position. He accepted.[6] Air Products subsequently filed this action in the court below.

Air Products clearly is concerned that Johnson may use the knowledge he acquired at Air Products about its on-site business and disclose that information to Liquid Air. Specifically, Air Products fears that Johnson may disclose trade secrets to Liquid Air about which Johnson learned as an Air Products employee. Air Products has developed its on-site business with great energy and financial expense. Liquid Air has not procured similar information related to on-site activities. This information includes technical data concerning the methods of delivery of on-site gas, status of negotiations with customers, and the analysis of market opportunities. Johnson was knowledgeable about all of these programs and technologies. While Johnson clearly does not have detailed knowledge about Air Product's market opportunities or about the technological process involved in the on-site mode of delivery of industrial gas, the record supports the trial court, when it said:

6. Johnson was to be paid $185,000 annually. His responsibilities were to be greatly expanded from those he had at Air Products.

Johnson does not know the minutiae of this process, but he well knows the problems Air Products encountered to make the process a success. Because he knows the conclusions of Air Products' research and field-testing, his knowledge would be extremely valuable to a competitor since it would cut the developmental risk involved in a similar project.

(Trial Court Opinion at page 7.)

Essentially, Air Products has developed substantial plans concerning the on-site delivery of gas. It has devoted significant resources to the development of these plans and considers their technological advancements and marketing strategies to be trade secrets. Johnson is familiar with these plans.

Air Products undertook to protect itself from disclosure of what it considers trade secrets by its employees by requesting its employees to agree to sign "Employee Patent and Trade Secret Agreements." In January of 1966, Johnson entered such an agreement in which he indicated that he would not disclose any information which Air Products considered confidential to anyone outside the corporation.[7]

7. The agreement signed by Johnson states:
   EMPLOYEE PATENT AND TRADE SECRET AGREEMENT
   Memorandum of Agreement by and between the undersigned, hereinafter designated as "Employee" and Air Products and Chemicals, Inc., a Delaware corporation, hereinafter designated as "Corporation".
   The Corporation is engaged in numerous fields of business and activities including research and development in the various existing and projected fields of the Corporation's business with the object of making discoveries and development of improvements including patentable inventions therein, and the exploration of avenues for extension of its activities into new fields.
   During employment by the Corporation, Employee will have access to information concerning one or more of the various corporation activities, including research work, development work, plant design, construction and operation, compositions, patent applications, technical reports and other confidential information originating in the Corporation or disclosed to the Corporation by others under agreement to hold the same confidential; and Employee may make discoveries and improvements which relate to or are useful in the business or activities in which the Corporation is or may be engaged, that may include patentable inventions.

In consideration of employment by the Corporation during such time as shall be mutually agreeable to Corporation and Employee, Employee agrees not to utilize any such information for his own benefit nor to disclose any such information to which he may have access to any one outside the Corporation, or to any officer or employee of the Corporation not also having access to such information; all records pertaining to such information, whether developed by Employee or others, shall be and remain the property of the Corporation. Employee agrees to disclose, in writing if so requested, to his immediate superior or to the Corporation's Patent Division any discoveries or improvements as above specified that he may make during the period of his employment by the Corporation or by its predecessors or successors in business; all such discoveries and improvements shall be and remain the property of the corporation. Employee further agrees to assign to the Corporation any such discoveries and improvements which the Corporation may deem to be patentable inventions, whether or not during the period of his employment such inventions may be reduced to practice, and to execute all patent applications, assignments and other documents necessary to vest in the Corporation the entire right, title and interest in and to said inventions and in and to any patents obtainable therefor in the United States and foreign countries.

The Corporation shall assume the entire expense of preparing, filing and prosecuting applications for patents for any such inventions, through patent counsel appointed by the Corporation.

Employee shall not be obligated to assign to the Corporation any invention made by him while in the Corporation's employ not relating to any business or activities in which the Corporation is or may become engaged, unless the same relates to or is based on confidential or proprietary information to which Employee shall have had access during and by virtue of his employment or arises out of work assigned to him by said Corporation. Nor shall Employee be obligated to assign any invention which may be wholly conceived by Corporation. Nor shall Employee be obligated to assign any invention which may be wholly conceived by Employee after he leaves the employ of the Corporation unless such invention shall involve the utilization of confidential or proprietary information obtained while in the employ of the Corporation. Nor shall Employee be obligated to assign any invention which relates to or would be useful in any business or activities in which the Corporation is engaged if such invention was conceived by Employee prior to his employment with the Corporation, provided that all such inventions are listed at the time of employment on the back of this agreement.

This agreement supersedes any prior agreement concerning assignment of patent rights between Corporation and Employee.

This agreement shall inure to the benefit of the Corporation, its successors, assigns and designees, and is binding upon the assigns, executors and administrators or other legal representatives of Employee.

The agreement evidences the efforts of Air Products to protect itself. While the force of the agreement is not as great as that which

When Johnson was interviewed for a position with Liquid Air no inquiry was made about any knowledge of trade secrets which he might have had. For that matter, there is no evidence that Johnson ever offered to disclose any such information. In fact, there is testimony, given by Liquid Air officials, that Johnson was instructed to refrain from disclosing any such information he acquired at Air Products which was unknown to Liquid Air. It is clear also that Johnson took no documents or property with him from Air Products to Liquid Air. It is evident that he did not and does not possess the knowledge to replicate any of the plans for any equipment or about the technological processes involved in this dispute.

The record indicates that Johnson is an honest man. There is no dispute as to his integrity. It is certain that he intends to refrain from disclosing any of the proven trade secrets of Air Products. Johnson's responsibilities at Liquid Air will be broader than those he had at Air Products. Thus, the likelihood of disclosure of secret information, is arguably less likely because Johnson will not be faced with circumstances where specific, confidential information may be disclosed. Hence, Johnson and Liquid Air conclude, an inadvertent disclosure of confidential information is very unlikely. Nevertheless, as Johnson and Liquid Air state in their brief:

> At the time he left Air Products on February 24, 1981, Johnson did have knowledge of a limited amount of specific information which he presently believes may be sensitive or confidential information of Air Products.

(Appellant's Brief at page 11.)

Air Products obtained an injunction against Johnson and Liquid Air on March 4, 1981. A hearing on the continuance of that objection was held from March 23, 1981 to April 6,

we would accord a restrictive covenant in an employment contract supported by consideration entered into by an employee and ex-employer, the agreement is not without value. We treat it herein as some evidence of a manifestation of Johnson's recognition that a confidential relationship existed between himself and Air Products during his employment with Air Products.

1981. These proceedings were conducted in the trial court as an in camera hearing and a representative of Liquid Air's executives was not permitted to participate in that portion of the hearing concerning the existence of trade secrets. Johnson participated in the hearing as did numerous attorneys who were actively involved in the representation of Liquid Air and an expert hired by Liquid Air. The trial court determined that Johnson did have knowledge of certain information which Air Products considered trade secrets and which the trial court concluded were trade secrets.[8]

The trial court stated:

Air products is developing its on-site business in certain areas which are particularly sensitive to its competitive market position. One of these is in petroleum recovery systems, which involve the injection of pressurized nitrogen into oil wells to increase productivity. Nitrogen injection is not a new technology. Confidential to Air Products, however, is its own appreciation of technical problems and safety precautions associated with the technology. Probably of even greater significance is the information and data collected by Air Products on current and future projects as well as on potential future opportunities for the firm. This information consists of the status of negotiations with customers, proposed plant configurations and methods of delivery as well as analysis of market opportunities. Johnson was in receipt of all reports on these matters and, indeed, prepared some himself. The information contained in these reports was developed at considerable expense by Air Products' personnel, including Johnson's subordinates. It is not the work product of Johnson himself, although he certainly shared in its development and analysis. The point we emphasize is that the identification of opportunities in the field as well as the extremely complex technological problems and commercial plans which must be made to exploit those opportunities is enormously time consuming and expensive.

8. At the conclusion of the hearing, all participants in the hearing were ordered by the trial court not to disclose any information concerning trade secrets presented in evidence at that hearing.

Many of these considerations apply with equal force to Air Products' business efforts in enhanced oil recovery. Air Products has developed a method of recovering heavy oil from the ground which would otherwise be nonrecoverable, and has successfully field-tested its method. While there has been disclosure as to the generalities of this project, the specifics are not generally known. Particularly sensitive are three technical factors relating to the treatment and ignitions of the gas and to the treatment of the well shaft. . .

(Trial Court Opinion pages 6–7.) Furthermore:

In addition, Air Products has developed a vacuum swing adsorption unit for the production of nitrogen. Johnson knows the material to be used as the adsorbent, the identity of which is not known outside of Air Products.

In addition to these matters of a technological nature, Johnson is in possession of great quantities of information which we characterize as commercial in nature. This information has been developed by Air Products through the concerted effort of all its employees in the on-site business.

(Trial Court Opinion page 8.) The trial court concluded that trade secrets existed in these areas.

Johnson and Liquid Air strongly note in their brief, and it is supported by the record, that no restrictive covenant into which Johnson entered concerning his employment after leaving Air Products exists. There is no evidence that any such covenant was contained in Johnson's original employment contract with Air Products in 1966. Nor is there any evidence of any contract including a restrictive covenant entered into by Johnson and Air Products at a later date.

■ Pennsylvania law permits the issuance of an injunction against an employee and employer to prevent the disclosure of information obtained by the employee while in the employ of the complainant ex-employer when an effective restrictive covenant is present in or incident to an employment contract *or* where trade secrets exist under circumstances when the Pennsylvania law of unfair competi-

tion requires that protection from disclosure be ordered. We need not review the law concerning restrictive covenants as Air Products *did not* choose to protect itself with an appropriate restrictive covenant. For a review of Pennsylvania case law in this area, see *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 392 A.2d 1383 (1978); *Aiken v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808 (1978); *Bryant v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164 (1977); *Enforcement of Restrictive Covenants In Pennsylvania Employment Contracts*, 80 Dick.L.R. 693 (1976) and cases cited therein.

■■■ Under Pennsylvania law, a person may be enjoined from engaging in employment or certain aspects of his employment where that employment is likely to result in the disclosure of information, held secret by a former employer, of which the employee gained knowledge as a result of his former employment situation. Thus, the issue herein is not whether Air Products took precautions to stop the disclosure of information, i.e., restrictive covenant, but whether Air Products possessed information which qualifies as trade secrets and whether a confidential relationship existed between Air Products and Johnson such that Johnson was prohibited from disclosing trade secrets revealed to him during the existence of that confidential relationship to a future employer. We are satisfied after a review of the entire record that a confidential relationship existed.

Our Supreme Court has said in *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 85–86, 86 A. 688, 691 (1913):

The duty of the servant not to disclose the secrets of the master may arise from an express contract, or it may be implied from their confidential relations.

It is likewise true that other persons who induce such disclosures by an employe, knowing of his contract not to disclose, or knowing that the disclosure is in violation of the confidence reposed in him by his employer, will be enjoined from making use of the information so obtained. Where confidence is reposed, and the employe by reason of the confidential relation has acquired knowledge of trade

secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer. An injunction may be granted to enjoin the use of a trade secret, or to restrain the manufacture and sale of an article so made against a defendant, who acquired his knowledge in violation of an express contract not to divulge, or in breach of confidence between employe and employer.

See *Computer Print Systems, Inc. v. Lewis*, 281 Pa.Super. 240, 422 A.2d 148 (1980). Therefore, an ex-employer can reasonably rely upon the obligation of its employees not to disclose trade secrets about which they obtained knowledge while working in a confidential relationship with that employer.

■ In *Felmlee v. Lockett*, 466 Pa. 1, 8, 351 A.2d 273, 277 (1976), our Supreme Court said:

This Court in *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 A. 688 (1913), set out the prerequisites for recovery upon a cause of action alleging misappropriation of trade secrets. "To be entitled to equitable relief, the burden was on [the employer] to show: (1) that there was a trade secret, or, as in the case at bar, a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of business; (3) that by reason of discovery or ownership the employer had the right to use and enjoyment of the secret; and (4) that the secret was communicated to [the employee] while he was employed in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer." 239 Pa. at 87, 86 A. at 691.

A trade secret is defined in the Restatement of Torts § 757, Comment B as:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competition who do not know or use it. It may be a formula for a chemical compound, a process of

manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . . *A trade secret is a process or device for continuous use in the operation of the business.*

(Emphasis added.) See *Felmlee v. Lockett,* supra, 466 Pa. at 9, 351 A.2d at 277. Furthermore, it is clear that trade secrets "must be particular secrets of the complaining employer and not general secrets of the trade in which he is engaged. *Capital Bakers v. Townsend,* [426 Pa. 188, 192, 231 A.2d 292, 293–294 (1967)]." Id.

The opinion of the court below clearly indicates that the petroleum recovery systems developed by Air Products were trade secrets meeting the requirements of the Restatement of Torts test. The court found that "Confidential to Air Products, . . . is its own appreciation of technical problems and safety precautions associated with the technology." (Trial Court Opinion at page 6.) The court found that these secrets were ones involving information known particularly to Air Products and not information known by members of the industry in general. We are satisfied also that the trial court acted properly where it held that some of Air Products' efforts in the area of "enhanced oil recovery" and the development of a "vacuum swing adsorption unit comprised trade secrets. The court properly found aspects of these projects involved technologies which were developed by Air Products and were not in general use in the industry. The court found trade secrets existed in "The information and data collected by Air Products on current and future projects as well as on potential future opportunities for the firm." Id. Thus, the court found that Johnson had information concerning "the status of negotiations with customers, proposed plant configurations and methods of delivery as well as analysis of market opportunities." Id.

We are aware that Comment B to Restatement of Torts § 757 states also:

A trade secret. . . differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the

business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business.

Air Products asserts that Johnson's knowledge of market related information encompassed the several opportunities of Air Products and as such comprised trade secrets. The court discussed these claimed secrets in the following manner:

Johnson was in receipt of all this information, which consisted of details of research and development projects and the emphasis the company places on certain of them, its projected capital spending program, certain proposed international projects, its plans regarding distribution of its gases via pipelines, as well as its bidding procedures. Johnson prepared the 1981–82 budget for his division, and thus knows its priorities of spending. He knows the business decisions made by Air Products with regard to its international operations, one of which constitutes a novel method of operation for the particular country involved. In another country Air Products has identified certain geographical areas which it considers potentially profitable and has planned a method to exploit the opportunities presented. Within the domestic market Air Products has plans with regard to pipeline delivery of gases which are extremely sensitive. Knowledge of any of these plans by a competitor could enable that company to thwart Air Products' plans or to compete without the burden of testing and market analysis born by Air Products. In addition, Johnson has familiarity with the bidding procedures practiced by Air Products. Within the industry negotiating and developing bids on projects takes a great deal of time, and the bids themselves are intensely competitive. Over the final five years of his employment with Air Products Johnson actively participated in bidding on approximately 100 projects. He knows Air Products costs

and pricing methods and in some cases its capital investment. All of these matters would be of great interest and benefit to a competitor.

(Trial Court Opinion pages 8–10.)

We are convinced that the court below considered this information and properly found that it was not generally known in the industry. The evidence represents a compilation of facts which gave Air Products an advantage vis-a-vis its competitors who do not know these facts. Thus, we hold that the decision of the trial court regarding the existence of trade secrets was properly considered in light of the standard established in Restatement of Torts § 757 and was correctly decided.

The trial court properly considered all the facts and circumstances which Air Products claimed comprised its trade secrets. We are persuaded, after a review of the lower court's opinion and the entire record, that the court properly concluded that trade secrets existed and what they were under the test established by our Supreme Court in *Macbeth-Evans Glass Co. v. Schnelbach*, supra.[9]

Next, Johnson and Liquid Air argue that the trial court improperly found that the secrets would be disclosed to Liquid Air. They argue the trial court improperly held that it was "inevitable" that Johnson would disclose the secrets to Liquid Air and that "inevitability" of disclosure is not the test for violation of a protected confidential relationship. We do not find fault with the trial court's opinion.

The trial court stated:

Pursuant to this legal standard, we are satisfied that it is necessary to enjoin Mr. Johnson from working in the on-site field for Liquid Air for a period of time. It is his duty, as an employee of Liquid Air, to devote his utmost talents and skills to the performance of his job, as he unquestionably did while working for Air Products. *It*

9. Liquid Air and Johnson argue that in its discussion of the injunction imposed by the court that: "The lower court thus used a nuclear warhead to obliterate what at most was a gnat." We find this comparison to be an unartful and extreme use of hyperbole which is simply inaccurate. (Appellant's brief, page 31.)

*would be impossible to perform his managerial functions in on-site work without drawing on the knowledge he possesses of Air Product's confidential information.* Thus, an order merely barring disclosure of certain items or types of information would be impossible to obey. Furthermore, to deny plaintiff a remedy until after a disclosure has been made would be to deny a remedy altogether. Equity will enjoin action when there is substantial threat of injury, without waiting for the injury to be inflicted.*

---

* For cases in which an ex-employee has been enjoined from working for plaintiff's competitor because of the *inevitability* of disclosure of protected information, see: *Allis Chalmers Mfg. Co. v. Continental Aviation and Engineering Corp.*, 255 F.Supp. 645 (E.D. Mich.1966); *Emery Industries, Inc. v. Cottier*, 202 U.S.P.Q. 829 (S.D.Ohio 1978); *B.F. Goodrich Company v. Wohlgemuth* [117 Ohio App. 493] 192 N.E.2d 99, 137 U.S.P.Q. 804 (Ohio App. 9th Dist.1963); *Fountain v. Hudson Cush-N-Foam*, 122 So.2d 232 (Fla.App.3d Dist. 1960).

(Trial Court Opinion page 18.) (Emphasis added.) Johnson and Liquid Air argue in their brief that the cases relied upon by the trial court can be distinguished from Pennsylvania decisional law.

In *Continental Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351 (3rd Cir. 1980), that court held that where Continental Group sued to enforce a restrictive covenant in an ex-employee's employment contract that a preliminary injunction improperly issued and that while the trial court found that the possibility of an inadvertent disclosure of confidential information existed that the risk of inadvertent disclosure was insufficient to justify the granting of a preliminary injunction. The court cited *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp.*, 255 F.Supp. at 648, 654 (E.D.Mich.1966), for the principle that:

A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue.

Id. at 359.

Pennsylvania law is similar to that found in *Allis-Chalmers*, supra. In *Jostan Aluminum Products Co., Inc. v.*

*Mount Carmel Dist. Indus. Fund*, 256 Pa.Super. 353, 357–358, 389 A.2d 1160, 1162–1163 (1978), we said:

It is fundamental that a party seeking a preliminary injunction of any nature must establish a clear right to the relief sought, and that immediate and irreparable injury will result if the injunction is not granted.

The trial court also reached its decision based upon an analysis of a decision of the Federal District Court for the Southern District of Ohio, *Emery Industries, Inc. v. Cottier*, 202 U.S.P.Q. 829 (1978). Ohio law like that found in Pennsylvania permits the restriction, by way of injunction, of an ex-employee's disclosure of trade secrets to his new employer where that employee obtained his knowledge of the trade secret while working with the former employer under circumstances where a confidential relationship existed. The facts in *Emery*, supra, as both parties agree, are similar to those found in the instant case.

The parties in *Emery*, supra, included two large manufacturers and distributors of ozone gas. An employee of one company who had knowledge of certain alleged trade secrets resigned from that company and went to work for the other. The first company sought an injunction. The court found the system by which the parties manufactured and distributed its product to be very complex and costly. The employee possessed general knowledge about certain bids entered by the first company on projects and the production buildups associated with those proposals. The employee also had a general knowledge of the first company's long range plans for development. Finally, the duties of the employee at his new job were to be of a similar type as that at his former job though his responsibilities would be broader. There was no claim that the employee took a document with him to his new job from his old one. The first employer only claimed that the violation of the confidential relationship resulted from risk that the general knowledge the employee possessed about his former employer's business operation which the ex-employer asserts were trade secrets would be disclosed to the new employer.

The court in *Emery*, supra, held that it would be:

virtually impossible for the defendant to perform his prospective duties for [his new employer] without in effect giving [it] the benefit of plaintiff's confidential information.

Johnson and Liquid Air distinguish the *Emery* decision on two factual grounds. First, they claim the danger of disclosure found in *Emery, supra,* is not present here; and, secondly, they claim that because the employee in *Emery, supra,* provided technical services for his former employer that his knowledge was more specified regarding the confidential information and therefore more demanding of protection. We are not persuaded by either of these arguments. The circumstances herein indicate a likelihood of disclosure similar to that found in *Emery, supra,* and the secret about which Johnson had knowledge could be appreciated by him both as an engineer and as a manager.

Johnson and Liquid Air distinguish also the *Emery, supra,* decision on grounds that the case law upon which it relies is in conflict with the decisions of the Pennsylvania courts. Those cases are *B.F. Goodrich Co. v. Wohlgemuth,* 117 Ohio App. 493, 192 N.E.2d 99, 137 U.S.P.Q. 804 (9th Dist.1963) and *Allis-Chalmers Manufacturing Co. v. Continental Aviation & Engineer Corp., supra.*

■ In *Goodrich, supra,* the court concluded that a substantial risk of disclosure existed because the employee therein had direct "technical responsibility" for the claimed secret while in the employ of the ex-employer. Johnson and Liquid Air argue *Goodrich, supra,* is distinguishable from the instant case because the trade secrets herein include nontechnical matters. This argument is misplaced. Under Pennsylvania decisional law, trade secrets need not be technical in nature. *Macbeth-Evans Glass Co. v. Schnelbach, supra.* Furthermore, Johnson and Goodrich distinguish *Goodrich, supra,* because the employee therein actually revealed trade secrets to his new employer. While this fact does lessen the strength of *Goodrich, supra,* as precedent, we recognize that the court herein did issue an injunction based upon all the evidence submitted it. We hold that while this

424

difference from the instant case may lessen the precedential weight given *Goodrich*, supra, it does not distinguish it. In any event, the precedential weight of *Goodrich*, supra, when applied to the case herein does not affect the value of the decision of *Emery*, supra, after all, the facts in *Emery*, supra, did not reflect any action by the employee revealing trade secrets to his new employer.

Johnson and Liquid Air contend that the decision of *Allis-Chalmers*, supra, relied upon by the court in *Emery*, supra, is distinguishable from the instant case. They argue that the trade secrets therein were clear, while those in the case herein were not. We are satisfied that the confidential information possessed by Johnson were clearly trade secrets.

Next, Johnson and Liquid Air assert that *Allis-Chalmers*, supra, is distinguishable because the trade secrets therein were technical in nature and the employee had technical knowledge and expertise. We find this argument without merit for the same reason we found no support for it as related to *Goodrich*, supra.[10]

Essentially, Johnson and Liquid Air remonstrate that the trial court improperly reasoned from *Allis-Chalmers*, supra,

**10.** Johnson and Liquid Air cite *Continental Group Inc. v. Amoco Chem. Corp.*, supra, at 360 for the position that *Allis-Chalmers*, supra, *Goodrich*, supra, and *Emery*, supra, are distinguishable from the instant case. The Third Circuit describes those cases as:

Other cases cited by Continental have also dealt with persons employed as engineers working in product development rather than managers involved in the manufacturing of finished products. [Footnote omitted.]

*Continental*, supra, involved an employee whose training was as a businessman. He had no education in engineering. His tasks were exclusively managerial. Johnson, on the other hand, is a trained engineer. While his vocational responsibilities are substantially managerial in nature, his efficiency and effectiveness is certainly enhanced by his background in engineering. We hold that the instant case is more similar to *Emery*, supra, where a chemical engineer was involved in research, design, manufacture, and marketing of the product. Johnson is an engineer who, though in a supervisory/managerial capacity was involved in the research, design and manufacture of industrial gases for Air Products. He was clearly involved also in the manufacture and marketing of the products produced by Air Products. Accordingly, we do not find Johnson's and Liquid Air's argument convincing.

*Emery,* supra, and *Goodrich,* supra, in holding that it was inevitable that Johnson would disclose information to Liquid Air.[11] They contend that inevitability of disclosure is not the proper standard by which the trial court can determine that it was clear that an immediate and irreparable injury would result unless an injunction issued. While we do not adopt the reasoning of the trial court or its use of the term inevitable, we are unable to find that the trial court committed reversible error.

The lower court held that: "It would be impossible [for Johnson] to perform his managerial functions in on-site work without drawing on knowledge he possesses of Air Products' confidential information." (Trial Court Opinion at page 18.) We are satisfied that this expression of its determination of the likelihood of disclosure was proper. The court reasoned that the duties which Johnson was to perform at Liquid Air would make it impossible for Johnson not to disclose trade secrets. This was precisely the reasoning of the court in *Emery,* supra, which we find persuasive. Both courts held it would be impossible for the employee to perform his duties at the new employer without disclosing trade secrets. Accordingly, we hold that the trial court acted reasonably when it issued a preliminary injunction. *Valley Forge Historical Society v. Washington Memorial Chapel,* supra; *Boyd v. Cooper,* supra; *Jostan Aluminum Products Co., Inc. v. Mount Carmel Dist. Indus. Fund,* supra.

■ The next issue raised by Johnson and Liquid Air, in their brief, states:

Even if an injunction were proper, it must be confined to the disclosure of proven trade secrets.

(Appellant's Brief, page 4.) Essentially, Johnson and Liquid Air argue that the injunction granted by the trial court is too broad.

The order of the trial court states:

11. The trial court also based its decision upon *Fountain v. Hudson Cush-N-Foam,* supra. We do not believe that a discussion of the *Fountain,* supra, decision is helpful or necessary herein.

NOW, THIS APRIL 6th, 1981, the Defendants as set forth below and collectively are hereby enjoined, restrained and prevented preliminarily until a final order from engaging in the following acts or any one of them:

A. That the Defendant Johnson is hereby enjoined and restrained from breaching or attempting to breach his employee agreement with Air Products and his fiduciary duty to Air Products if employed by Liquid Air by disclosing to Liquid Air or using for the benefit of Liquid Air trade secrets and confidential information of Air Products acquired by Johnson during the course of his employment with Air Products;

B. That the Defendant Liquid Air is hereby enjoined and restrained from misappropriating trade secrets and any confidential information of Air Products acquired by Johnson during the course of his employment by Air Products;

C. That the Defendant Johnson is hereby enjoined and restrained from accepting employment or being engaged in, directly or indirectly, the on-site or tonnage gas business;

D. That the Defendant Liquid Air is hereby enjoined and restrained from hiring Johnson in any capacity involving directly or indirectly, any information concerning any items enumerated in the affidavit of Arthur W. Mellen attached to the Complaint filed in the within matter;

E. The defendant Johnson is hereby enjoined and restrained from disclosing, directly or indirectly, any information revealed in the closed session portions of the hearing held in the within matter;

F. This preliminary injunction is on condition that the Plaintiff deposit with the Clerk of Court, Civil Division, legal tender of the United States in the amount of $5,000.00, said amount to be held by the Clerk of Courts upon the same conditions as is provided for in the injunction bond;

G. And, finally, that this injunction continue in effect until a final order on the motion for a preliminary injunction is filed by this Court.

On August 7, 1981, the trial court entered an order continuing the injunction until March 7, 1982, eight months later.[12]

Initially, we note that Mr. Slattery, a senior executive at Liquid Air, directly superior to Johnson, testified that Johnson's work with Liquid Air would only in minor part involve the on-site activities of Liquid Air. The court below questioned Slattery and he responded as follows:

THE COURT: Mr. Slattery, if this litigation were terminated with no restrictions whatsoever on Mr. Johnson's activities with Liquid Air, what would you estimate would be the amount of time he would be spending on on-site functions:

To put it another way, is he really being hired because of his expertise in on-site?

THE WITNESS: No, Your Honor, he's not. He's being hired because of his inherent capabilities. His on-site experience is important to us only because it shows he had a successful track record. He was successful in the on-site activity. As relative to how much time is spent on on-site versus merchant versus cylinder versus distributor work, I'd—I really—it's a relatively small amount. It would probably—I've never made an estimate, we don't try to keep track of it, 10, 15, 20 percent, I don't know, small amount relatively.

Thus, we would read the impact of the injunction imposed by the trial court in light of Slattery's testimony. Johnson's responsibilities would not comprise substantially on-site work. Logically, therefore, he can undertake his employment with Liquid Air and focus all his energies on non-on-site facets of their business. Nevertheless, our conclusion need not rely upon a logical extrapolation of the facts presented the court below.

The issue raised by Johnson and Liquid Air in their brief was not framed as an issue in their exceptions. The excep-

12. The affidavit of Arthur Mellen indicates what areas of development and planning the Process Systems Group, one of four segments of Air Products involved in the manufacture, sale and operation of "on-site" facilities, are involved in and what facts, plans and conditions are considered trade secrets by that segment of Air Products.

tions attack the existence of the various alleged trade secrets but never present an attack upon the breadth of the injunction based upon the claimed non-existence of these secrets. We have nevertheless already held herein that the trade secrets of which the injunction bans disclosure were proven. Accordingly, our decision herein ante would, were we to reach a decision, require that we hold that the injunction is not too broad, however, we do not need to so hold having determined that the issue is waived. Pa.R.C.P. 1518.

■ The final issue raised by Johnson and Liquid Air states:

Defendant Liquid Air should not have been subjected to an injunction at a hearing from substantial parts of which its representatives were excluded.

(Appellants' Brief, page 32.) [13] They argue that our scope of review that "we will look only to see if there were any apparently reasonable grounds for the action of the court below," *Robinson Electronics Supervisory v. Johnson,* 397 Pa. 268, 274, 154 A.2d 494, 496 (1959), quoting from *Lindenfelser v. Lindenfelser,* 385 Pa. 342, 343, 123 A.2d 626, 627 (1956), must be made broader in the instant case because Liquid Air was not given full opportunity to defend itself at the in camera proceedings held by the trial court, when it took evidence to determine whether and what trade secrets existed.[14]

Johnson and Liquid Air state in their brief:

13. We note that Liquid Air did not object in their pre-trial motions, to the proceedings being held in camera but rather objected to the absence of an employee representative of Liquid Air at the hearing.

14. At the hearing on pre-trial motions, an attorney for Johnson and Liquid Air, Bancroft D. Haviland, stated that the appellants presented a memorandum of law in which they present the Pennsylvania law and federal law which hold that, "traditionally a party is entitled to be in a hearing, or at least a representative of a party [is entitled to be at the hearing.] He stated "by representative it means somebody in the organization who has some knowledge concerning the facts in that organization, ..." For reasons we state herein we do not believe this is a correct statement of the law in the area of law involving the protection of trade secrets.

On application of Air Products prior to the hearing, the lower court ruled that no representative of Liquid Air, other than counsel, would be permitted to be present when Air Products' witnesses offered testimony concerning alleged trade secrets or confidential information of Air Products. In addition, those persons present at the closed portions of the hearing, including counsel, were barred from revealing what evidence had been presented. Over Liquid Air's protest, these rulings were adhered to during the course of the hearing. Thus, although Liquid Air was a defendant with substantial rights and privileges in jeopardy, it was permitted neither to be present during the great majority of the hearing nor to know the substance of the evidence presented against it during the closed portions of the hearing.

As a direct result of those rulings, Liquid Air was denied its basic right to hear and confront witnesses against it. In a more practical sense, both defendants were put to an extreme disadvantage in rebutting the claims of Air Products. Since the whole theory of Air Products' case was that it (and Johnson) possessed confidential information, it would have been a complete defense to show that Liquid Air personnel were aware of the "trade secrets" without Johnson's help. The lower court's secrecy rulings, however, effectively deprived Johnson and Liquid Air of the ability to prepare and present such a defense.

(Appellant's brief at pages 33–34.) [15]

In *Triangle Mfg. Co. v. Paramount Bay Mfg. Co.*, 35 F.R.D. 540, 543 (1964), the United States District Court for

15. In *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 110–111, 360 A.2d 200, 204 (1976), our Supreme Court said:

> Appellants first contend that they were denied due process because appellant Newbauer was not present at an in camera hearing during which testimony was taken describing the appellee's secret process. Appellants' attorney, however, was present at all times. This procedure was not objected to at trial and was, in fact, agreed upon by the parties. Consequently, appellants have waived any objections to the in camera procedure by failing to

the Eastern District of New York discussed the obligation of a party to divulge certain information which it considers commercially sensitive in response to interrogatories. The court said after determining that the interrogatories placed an unreasonable burden on the party to which they were directed:

It is the opinion of the court, however, that such an order must be accompanied by a protective order pursuant to Rule 30(b). Plaintiff has objected and properly so, to the divulgence of certain information pertaining to its customers and sources of supply. While there is no absolute privilege protecting such information, *Louis Weinberg Associates, Inc. v. Monte Christi Corp.*, 15 F.R.D. 493, 495 (S.D.N.Y.1954), this court is most reluctant to make it available to a competitor such as Paramount. Cf., *United States v. Continental Can Co.*, 24 Fed.Rules Serv. 33.321, Case 5 (S.D.N.Y.1957). It would seem, therefore, that the proper procedure would involve the selection of an impartial third person, to be paid by Paramount but acceptable to each party, who will examine Triangle's records with regard to the information sought in interrogatories 2(a) through 2(e) and 5(a) through 5(d). See *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 23 Fed.Rules Serv. 26b.31, Case 3 (S.D.N.Y.1956); *Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*, 12 F.R.D. 531 (S.D.N.Y. 1952). This third person will tabulate the information pertaining to triangle's customers and sources of supply in such a manner as to give Paramount the maximum amount of information while at the same time maintaining the secrecy of the actual suppliers and customers. The identity of this third person, as well as the precise nature and scope of these tabulations, are to be agreed upon by the parties and incorporated, in detail, into the order to be submitted herein. Since the information sought by interrogatory No. 1(c) can in no way be regard-

raise them at trial. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).
We have found no other Pennsylvania decision which specifically discusses this matter.

ed as a trade secret, inspection of the records pertinent thereto shall proceed without any protective order.[16]

We find persuasive, the analysis of the court presented in *State v. O'Neil,* supra, at 533, 78 N.W.2d at 923, 62 ALR 2d at 505, where it said:

If Ampco is required to give evidence in public as to the nature of its trade secrets which it seeks to protect in the pending circuit court action, such public disclosure will destroy the value of such trade secrets so sought to be protected. In *Cincinati Bell Foundry Co. v. Dodds,* 1885, 19 Wkly., Law Ball. 84, 10 Ohio Dec. Reprint 154, Judge Taft, later Chief Justice of the United States, declared: "The property in a secret process is the power to make use of it to the exclusion of the world. If the world knows the process, then the property disappears. There can be no property in a process, and no right of protection if knowledge of it is common to the world."

It is therefore, apparent that if the order of Judge O'Neill, which denied Ampco's motion that the evidence related to the nature of Ampco's trade secrets be taken in camera, is permitted to stand, Ampco is faced with the Hobson's choice of either making public disclosure of its trade secret or abandoning its efforts to secure judicial protection of such secrets.

The view which the court in *State v. O'Neil,* supra, articulated was in part the position of the court in *Macbeth-Evans Glass v. Schnelbach,* supra, to the extent that our Supreme Court found no fault with the procedure agreed to by the parties, that no information regarding trade secrets therein should be published in the record. Thus, the court at the very least recognized that when dealing with trade secrets

16. Another helpful discussion of this problem is found at 62 ALR 2d 509 which is an annotation entitled, "In camera trial or hearing and other procedures to safeguard trade secrets or the like against disclosure in course of civil action involving such secret." This discussion follows the presentation of a case relied upon heavily by the trial court and Air Products, *State of Wisconsin ex rel. Ampco Metal, Inc. v. William I. O'Neil,* 273 Wis. 530, 78 N.W.2d 921, 62 ALR 2d 501 (1956). That case is substantially similar to the instant one.

that non-disclosure to the public at large, through the record was proper.

Recognition of the importance of non-disclosure can be found in other Pennsylvania decisions. It is clear that a general, public disclosure of a trade secret, by a party seeking to protect its interests results in an abandonment of that trade secret. *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965); *Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 38 A.2d 33 (1944). Similarly, the act of making trade secrets available to the public by incorporating those secrets into the design of a product risks public disclosure because, without engaging in any improprietous act, the trade secret may be copied. *Van Products Co. v. General Welding and Fabricature Co.*, supra. Thus, a public disclosure of trade secrets under Pennsylvania Law is of serious consequence to the holder of that secret. It is a logical conclusion from our courts reasoning in trade secret cases that the non-disclosure of trade secrets must be protected.

Johnson and Liquid Air argue that the rules of Civil Procedure require that we reach a different decision. They direct our attention to Pennsylvania Rule of Civil Procedure 223 which provides in pertinent part:

Rule 223 Conduct of the Jury Trial

(a) Subject to the requirements of due process of law and of the constitutional rights of the parties, the court may make and enforce rules and orders covering any of the following matters, *inter alia* :

(1) . . .

(2) . . .

(3) . . .

(4) Regulating or excluding the public or persons not interested in the proceedings whenever the court deems such regulation or exclusion to be in the interest of the public good, order or morals.

It is argued that this rule prohibits the exclusion of parties, i.e., Liquid Air, from proceedings because it constitutes a

person "interested in the proceeding." While we recognize that the right of a litigant to be present at the time his case is heard, is a cherished right. *Mullane v. Central Hanover Bank and Trust Company*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1949); *Krull v. Krull*, 236 Pa.Super. 207, 344 A.2d 619 (1975), we also are aware that the right is not absolute. *Dublin Sportswear v. Charlett*, 485 Pa. 633, 403 A.2d 568 (1979); *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, supra; *Philadelphia Corp. v. Trident Enterprises, Inc.*, 264 Pa.Super. 76, 399 A.2d 131 (1978). Accordingly, we do not find that Rule 223 requires that we hold that the trial court erred in excluding Liquid Air from the in camera hearing.

It appears to us that this matter was one largely within the discretionary powers of the trial court to decide, *DeFulvio v. Holst*, 239 Pa.Super. 66, 362 A.2d 1098 (1976). The court was confronted with circumstances where Air Products sought to protect what it believed to be trade secrets. Liquid Air on the other hand desired to assert its interests and to defend those interests at the proceedings below. The interests of the parties, however, could not be fully reconciled because Liquid Air's desires to fully participate in any hearing could result in their obtaining knowledge of Air Products trade secrets if in fact they were found to exist. Therefore, the court sought to accomodate the interests of both parties. The court permitted Air Products, Johnson, an expert for Liquid Air,[17] and counsel for Air Products, Johnson and Liquid Air to participate in the hearing. We cannot find this action to have been an abuse of discretion.[18] In

17. Mr. Albert Karnuth, an expert for Liquid Air from the firm of Arthur D. Little of Cambridge, Massachusetts, attended the hearing, and worked conscientiously to prove that the information which was claimed as trade secrets by Air Products was publicly known.

18. Liquid Air asserts that it had a right to be present at the in camera hearing and that its rights were violated without its counsel alone appeared at the hearing.

Our General Assembly has provided at 42 Pa.C.S.A.:
§ 2501. Appearance in person or by counsel

fact, we are unable to see what other alternative was available to the court short of permitting Liquid Air to procure knowledge of the trade secrets and thereby defeat the entire purpose of the action initiated by Air Products. Courts in other jurisdictions have clearly reached the same conclusion as we do today. *Star v. O'Neil,* supra.

In federal court, the trial judge has similar discretion as to whether the proceedings may be limited to the parties or their attorneys in order to protect trade secrets. See *F.T.C. v. Lonning,* 539 F.2d 202 (D.C.Cir.1976), and cases cited therein at 539 F.2d at 211. In *F.T.C. v. Lonning,* supra, a case involving the potential disclosure of trade secrets, the court held:

> We see no abuse of discretion in limiting the disclosure of the individual brand cost data to counsel of record. Although this court has previously commented that there may be some distinction between disclosure of trade secrets to house counsel and outside counsel, [footnote omitted] [*F.T.C. v. Crowther,* 139 U.S.App.D.C. 137, 430 F.2d 510, 515 (1970)], we find no abuse of discretion in refusing to limit such disclosure in this case.

■ We have held that the conduct of a trial is uniquely within the discretion of the trial judge. In *DeFulvio v. Holst,* supra, 239 Pa.Super. 68, 362 A.2d at 1099, we said:

> It is axiomatic that the conduct of a trial is the province of the judge. His discretion, exercised without abuse, must control.

The actions of the trial court herein were proper and did not result in an abuse of discretion.

Accordingly, having determined that the order of the trial court was correctly decided, we affirm.

MONTGOMERY, J., concurs in result.

(a) Civil matters.—In all civil matters before any tribunal every litigant shall have a right to be heard, by himself and his counsel, or by either of them.